IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>MANUEL GILBERT JIMENEZ,<br><br>Defendant. | **ORDER and**<br>**MEMORANDUM DECISION**<br><br>Case No. 2:07-cr-890 CW |

Now before the court is Defendant Manuel Gilbert Jimenez's motion *in limine* to exclude various hearsay statements against him. (Dkt. No. 84). For the reasons discussed below, that motion is DENIED.

## BACKGROUND

Mr. Jimenez has been charged with federal crimes related to an alleged insurance fraud scam. In short, the government contends that Mr. Jimenez agreed with Julie Martinez that Ms. Martinez would obtain a life insurance policy upon which a fraudulent claim would later be made by a third party using a forged death certificate provided by Mr. Jimenez. Mr. Jimenez, Ms. Martinez, and the third party would then split the proceeds of the policy. In the end, Ms. Martinez took out the policy, but she was tragically murdered soon after she did so.

Because Ms. Martinez is deceased and not available to testify against Mr. Jimenez, the government intends to introduce statements about the alleged conspiracy that Ms. Martinez made to her daughters, Elisa Kelly and Melissa Kelly. The government was initially expansive and imprecise about the statements it anticipated offering against Mr. Jimenez. The initial proffer

1

consisted of hundreds of pages of interview summaries of statements made by the daughters at various times during the investigation to several investigating officers. The government has now filed a submission in which it identifies the specific statements that it intends to introduce against Mr. Jimenez. (*See* Dkt. No. 152.) The government presents these statements into two categories: general statements about the scam, and more detailed, specific statements about the scam. The content of those statements will be discussed as appropriate below.

Mr. Jimenez moves *in limine* to exclude each of those statements, asserting that their admission would violate his rights under the Confrontation Clause and that they are inadmissible hearsay. The government contests each of Mr. Jimenez's arguments and seeks a ruling that all of the proffered statements are admissible.

**ANALYSIS**

**I.    Confrontation Clause**

Mr. Jimenez argues that it would be a violation of the Sixth Amendment's Confrontation Clause to admit Ms. Martinez's statements to her daughters. He contends that these statements amount to testimony against him, and he is denied the opportunity for cross examination. The Tenth Circuit has recently made clear in *United States v. Smalls*, 605 F.3d 765, 775-76 (10th Cir. 2010), that the admission of hearsay implicates the Confrontation Clause only if the statements are testimonial. The admission of hearsay is not barred by the Confrontation Clause if the statements are non-testimonial. *See id.* at 780. A court deciding whether non-testimonial statements may be introduced against a criminal defendant need only determine whether they are admissible under an exception to the bar on hearsay. *See id.* The Tenth Circuit has formulated two similar tests for whether a statement is testimonial, thus implicating the Confrontation

2

Clause, as follows:

> Synthesizing *Crawford* and *Davis*, we might today formulate a definition of a testimonial statement which reads: [1] a formal declaration made by the declarant that, when objectively considered, indicates the primary purpose for which the declaration was made was that of establishing or proving some fact potentially relevant to a criminal prosecution. Or, to better conform to the current state of Tenth Circuit precedent, we might say: [2] A formal statement is testimonial if a reasonable person in the position of the declarant would objectively foresee that the primary purpose of the statement was for use in the investigation or prosecution of a crime.

Id. at 778.

Under either of these formulations, the statements that Ms. Martinez made to her daughters are not testimonial. First, under both formulations, it is "essential" that a declaration have some degree of "formality" to be considered testimonial. *Id.* at 1279 (internal quotation marks and citation omitted). While a high level of formality is not needed, the practical question is whether from an objective speaker's perspective, the statements are "more akin to casual remarks to an acquaintance" or whether they are closer to "formal declarations to an official." *Id.* at 1279-80. For example, in *Smalls*, the Tenth Circuit concluded that a prisoner's casual conversation with a cell mate about a murder lacked the formality needed to characterize the conversation as testimonial. *See id.*

Here, Ms. Martinez made all of the proffered statements to her daughters during casual, private conversations. Moreover, both of her daughters described close, trusting relationships with their mother. Further, there was testimony that while Ms. Martinez considered making her statements somewhat more formal by writing them down, Ms. Martinez repeatedly decided not to do so. This lack of formality alone precludes a conclusion that Ms. Martinez's proffered statements are testimonial. *See id.*

Moreover, even if Ms. Martinez's statements were sufficiently formal, they lack the other criteria to make them testimonial as well. In addition to formality, a testimonial statement must have as its objective "primary purpose" to "establish[] or prov[e] some fact potentially relevant to a criminal prosecution" or to have it "use[d] in the investigation or prosecution of a crime." *Id.* at 778. From the context of Ms. Martinez's conversations with her daughters, these were not her objective primary purposes in making the proffered statements. Instead, Ms. Martinez told her daughters about the alleged scam with the primary purposes of lessening her stress and fear about her situation and keeping them informed about events in her life. Ms. Martinez's daughters had a close friendship with her. The conversations took place in the home, at a laundry mat or in the car. The daughters described their mother as nervous and upset when she spoke to them about the scam. From an objective standpoint, confiding in trusted people is an effective way to relieve anxiety or fear about something. Further, Ms. Martinez was deeply involved in her daughters' lives. The reasonable inference from the evidence is that Ms. Martinez wanted her daughters to know about the scam, not only to explain why she was acting strangely, but also in case she completed the plan, disappeared, and the daughters learned of her purported death from a public report. Given the close relationship Ms. Martinez had with her daughters, it is reasonable to conclude that she did not want them be experience the grief of believing their mother was dead once she disappeared. Under the circumstances presented in this case, the statements do not have the objective characteristics of the formality required to satisfy the first part of the test articulated in *Smalls*.

The statements also fail to satisfy the second part of the *Smalls* test which requires that the purpose of the statement was to prove some fact potentially relevant to a criminal

4

investigation. Mr. Jimenez argues that this requirement is satisfied because a reasonable person in Ms. Martinez's situation could foresee that if she were killed, her daughters would likely reveal what she had told them about the scam to law enforcement. He argues further that the evidence supports a finding that the purpose of the statements was to provide information to her daughters which they could take to the police in the event of foul play. Mr. Jimenez relies upon the testimony of Elisa Kelly that she got the impression that Ms. Martinez may have wanted Elisa to know about the scam so Elisa could relay facts about it to the police if Ms. Martinez were killed. His argument fails. On the record in this case, the expectation that her daughters may talk to the police was at best a secondary purpose for Ms. Martinez' statements to her daughters. First, while Ms. Martinez may have feared that she may be killed for her involvement in the scam, there is no indication in the record that she expected this would happen. Indeed, if she had had that expectation, it is unreasonable to conclude that Ms. Martinez would have gone forward with the plan. Reason suggests only that she went forward expecting the scam would be successful. In light of that expectation, the only reasonable inference is that Ms. Martinez would not have wanted her daughters to tell officials about the scam.

The disclosure was made for private and family reasons, not with the primary purpose of informing officials about a crime. Even if Ms. Martinez may have wanted police and prosecutors to know what happened if she died, this desire was at best a secondary purpose of telling her daughters about the scam. In context, the primary reason for Ms. Martinez's statements was to confide in her daughters. Further, there is no indiction that Ms. Martinez ever expressly told her daughters to share the information with police if she died. And, as mentioned, Ms. Martinez decided several times not to write down the information, weakening an argument that her main

5

goal was to leave clues.

In sum, Ms. Martinez' statements to her daughters were not made with the formality required to satisfy the *Smalls* test and were not made with the primary purpose of providing information to be used in the investigation of criminal activity. For all these reasons, the court finds that none of the proffered statements that Ms. Martinez made to her daughters are testimonial. Accordingly, the Confrontation Clause does not preclude their admission. Ms. Martinez' statements to her daughters are, however, still hearsay, which requires further analysis as to whether they may be used against Mr. Jimenez.

## II. Applicability of Hearsay Exceptions

The government does not dispute that Ms. Martinez's statements to her daughters are hearsay. Instead, the government seeks to admit them under either Federal Rule of Evidence 804(b)(3), the exception for statements against interest, or Rule 807, the residual exception. Mr. Jimenez argues that neither of these exceptions applies, and to the extent that they might, the statements must be carefully parsed. As discussed further below, each of the proffered statements Ms. Martinez made to her daughters is admissible in their entirety under Rule 804(b)(3).

### A. Generalized Statements About the Scam

In what the government characterizes as general statements, Ms. Martinez described the overall structure of the scam to Elisa and Melissa. Ms. Martinez was to take out a life insurance policy for $250,000 and name a third party as the beneficiary. Her accomplice would then obtain a fake death certificate and the beneficiary would make a claim on the policy. Finally, the three of them would split of the policy proceeds, with $100,000 going to Ms. Martinez, $100,000

going to the accomplice, and $50,000 going to the beneficiary.

Undeniably, telling someone that you are involved in a scheme to defraud a life insurance company and describing the scheme is a statement that, "at the time of its making," would " so far tend[] to subject the declarant to. . . criminal liability" that "a reasonable person in the declarant's position would not have made the statement unless believing it to be true." Fed.R.Evid. 804(b)(3). In other words, a reasonable person in Ms. Martinez's position would not admit that she had agreed to carry out the scheme unless she believed that her admission was true because making such an admission would greatly tend to expose her to criminal liability when she made it. As statements against interest, these statements are admissible despite the fact that they are hearsay.

Mr. Jimenez's argument otherwise is unavailing. Mr. Jimenez contends that these statements would not subject Ms. Martinez to criminal liability because they were no more than Ms. Martinez relaying a criminal proposition that someone had made to her. This argument finds some support in the record, since Ms. Martinez did not expressly tell her daughters that she had actually taken out the insurance policy.

But from the content and context of the statements, it is clear that Ms. Martinez was not merely telling her daughters about a proposed plan. Rather, the weight of the evidence compels the conclusion that Ms. Martinez had agreed to the plan and telling her daughters about her intent to proceed with it.[1] For example, Ms. Martinez expressly told Melissa that "she was going to

---

[1] Other evidence to be offered in the case, other than the statements made to the daughters, will be offered to show that she did act to further the agreed upon scheme. The court need not, however, rely on this evidence to find that Ms. Martinez had agreed by the time she spoke to her daughters.

7

take out" a policy (Tr. 38) and, in another statement, that there was "[n]o turning back." (Tr. 40.) Moreover, nothing about the statements themselves directly supports a conclusion that the accomplice was merely asking her to participate. The circumstances surrounding the statements also suggest an agreement or ongoing plan. Ms. Martinez was fearful and agitated when she talked about the scheme, suggesting she was knew she might be in legal or other trouble. She wrote notes about the scheme only to rip them up. She began to receive calls and meet with a man with whom her daughters were not familiar, supporting some aspects of her statements. Statements and circumstances such at these clearly point to a finding that Ms. Martinez was relaying more than a simple proposal, but instead admitting to an agreement to be part of a scheme.[2]

### B. Specifics of the Plan

In the statements that the government describes as specifics of the alleged scam, Ms. Martinez told her daughters several details about the scheme. These include the purported name of the man who hatched the scam ("Manuel" or Manuel Jaramillo"), his role of obtaining a fake death certificate, the name of the beneficiary ("T.B."), and the part of the plan involving the fake death certificate. With these statements, Ms. Martinez was revealing an inside participant's knowledge of the planned crime, including the source of the fake death certificate and the name of the beneficiary.

---

[2] Since a reasonable person would believe that agreeing to commit a crime would subject him or her to criminal liability, admitting to such an agreement appears sufficient to meet Rule 803(b)(3). Mr. Jimenez appears to concede this point in his argument that she was not making an admission, but relaying a proposal. To the extent that the rule contemplates a declarant admitting to more than an agreement, the record supports a finding that Ms. Martinez believed that her accomplice was working toward completing the scheme, such as by providing Ms. Martinez with the name of the beneficiary.

As with the general nature of the plan, it is unmistakably against one's interest to talk about details of an unfolding crime, or a crime that one intends to begin to carry out soon. For example, knowing that T.B. was to be the beneficiary would implicate Ms. Martinez because she could then not deny filling out– or at least having knowledge of– the contents of the application. Likewise knowing the name of the accomplice would implicate her, since she cannot deny knowing him. Accordingly, these details are all sufficiently against Ms. Martinez's interest to make them admissible under Rule 804(b)(4).

This ruling includes the specific statements in their entirety. The first category of specific statements are those in which Ms. Martinez identified the name of her accomplice. While some of these statements may implicate Mr. Jimenez because the government contends that "Manuel" and "Manuel Jaramillo" are aliases for Mr. Jimenez, the fact that they inculpate him alone does not make them untrustworthy or inadmissible. *See Smalls*, 605 F.3d at 780-81 (a statement implicating another person does not make it *per se* untrustworthy). Rather, courts have more commonly held that blame-shifting statements lack trustworthiness when made to investigators while in custody. *See id.* Such was not the case here. There is no indication in the evidence presented that Ms. Martinez was naming Manuel in an attempt to shift blame from herself. There is no testimony to indicate that Ms. Martinez expected to caught engaging in the criminal act and that her statements about Manuel would lessen her role in the crime or her willingness to go along with it. And, as already intimated, knowing the identity and role of an accomplice is sufficiently against one's interest to be admissible under Rule 804(b)(3).

Further the parts of those statements indicating that she met her accomplice through DeDe Cordova are also admissible. As acknowledged in *Smalls*, even facially neutral statements

9

may be against interest when considered in context. 605 F.3d at 782. Here, giving the name of a mutual acquaintance, while not incriminating in itself, would connect Ms. Martinez to her accomplice, which would expose her to criminal liability.

Second, the statements in which Ms. Martinez said that it was her accomplice's instruction to list T. B. as the beneficiary are admissible. In these statements, Ms. Martinez is not attempting to shift blame for the scam to her accomplice, but describing the roles each party was playing. Knowing who the beneficiary was and that the beneficiary was related to the scheme through the accomplice could certainly implicate Ms. Martinez.

Third and finally, Ms. Martinez's statements about the fake death certificate are admissible. Mr. Jimenez argues that obtaining a phony death certificate is a generic part of any life insurance scam. But one can easily think of at least one other way to file a false life insurance claim: that is, faking one's death and submitting an official death certificate. Accordingly, Ms. Martinez's statement indicating the she knew that the accomplice would have a phony death certificate made by his associates was against her self interest.

In a similar vein as his argument about the general statements, Mr. Jimenez argues that nothing about the specific statements show that Ms. Martinez had done anything but passively listened to a proposed scam. The court rejects this argument for the same reasons already discussed.

### III. Other Arguments

In addition to challenging certain of the proffered statements as hearsay, Mr. Jimenez asserts that there are some inconsistencies about her daughters' accounts of the statements over time. The court views these arguments as going to weight and not admissibility.

Finally, the court need not address the government's contention that the residual exception would apply to these statements. They are admissible as against Ms. Martinez's self interest.

**CONCLUSION AND ORDER**

For the foregoing reasons, Mr. Jimenez's motion is DENIED.

SO ORDERED this 19th day of November, 2010.

_____
Clark Waddoups
U.S. District Court Judge